TRIENT PARTNERS I, LTD., Plaintiff,

v.

**BLOCKBUSTER ENTERTAINMENT CORPORATION, Defendant.**

Civ. A. No. H–94–3269.

United States District Court, S.D. Texas.

Jan. 8, 1996.

Daniel K. Hedges, David Lee Burgert, Houston, TX, for Plaintiff.

Bruce R. Coulombe, Montgomery, TX, for Defendant.

OPINION ON LIMITED REMAND

HUGHES, District Judge.

### 1. Introduction.

This court entered an interlocutory order on November 30, 1995, interpreting the franchise clauses of the System License between Trient and Blockbuster. Blockbuster appealed seeking a stay, a reversal, and a writ of mandamus. The court of appeals entered a stay on December 7 and then lifted it on December 13 for the district court to consider a newly-filed motion for severance to make the interlocutory order final. On the limited remand Blockbuster has asked for substantive reconsideration of the order about the termination clause.

The court's response to the application for the writ of mandamus is an appendix to this opinion so that it will formally be part of the record of this action. Supplementing that are several conversations with counsel on the record.

### 2. Background.

In the mid–1980s Blockbuster engaged James M. Grisebaum to develop videotape rental stores in the Pacific Northwest. As authorized under the contract, Grisebaum now operates through Trient Partners. By the middle of 1995, Trient had established about forty "superstores" to rent videotapes under the Blockbuster name in Oregon and Washington.

The life of the agreement between Blockbuster and Trient spans the formative years of the business of video rentals. In 1970 no household in America had a video cassette recorder, but by 1990, 67 million households

had VCRs, which is about 79%. W. Michael Cox and Richard Alm, *These are the Good Old Days: A Report on U.S. Living Standards,* Federal Reserve Bank of Dallas, 1993 Annual Report at 4; *The Society,* FORTUNE, Oct. 21, 1991, at 55. In 1987 Blockbuster had a total of 133 stores under its system, and by 1995 it had 3,089 stores. In the early years almost one-half of the stores were franchises, but now only one-fifth are franchises. While Trient opened its forty-three stores, Blockbuster grew from an entrepreneurial effort to an industry giant and then to membership in a media conglomerate.

In 1995 Blockbuster itself began opening stores to sell recorded music and laser videodiscs. It opened a Blockbuster music outlet near one of Trient's principal Blockbuster video stores in Portland. Trient sought this court's interpretation of the agreement to ascertain whether Blockbuster's exploitation of Trient's videotape presence for its partially competitive music and laser videodisc stores was permissible.

After this court's determination in the summer of 1995 that Blockbuster could indeed compete with Trient in the video business, Trient began to consider selling its operation. Trient and Blockbuster negotiated about Blockbuster's acquiring the operations, but they could not agree on a price.

Trient retained an investment banker to sell its operation. Blockbuster became alarmed when it learned that the interested parties included other video rental chains—major, direct competition to Blockbuster. Trient's plan was to sell the locations and to return the proprietary personalty to Blockbuster, ending the relation. Having now become the aggrieved party in this case, Blockbuster wants to use its license agreement to cloud the title to Trient's leases of the sites themselves. These leases are between Trient and independent third parties.

Trient is profiting, and Blockbuster gets four percent of Trient's gross. It is this very profitability that Blockbuster wants to keep captive. Trient's stores have a gross revenue of about $30 million annually, that yields about $100,000 per month to Blockbuster. More important, the bidding for the underly-ing leaseholds was to be in the neighborhood of $70 million.

Blockbuster did not deny that it had in fact received its reliance costs, including a handsome profit, from its commitment of resources to Trient's region; Blockbuster's costs are essentially the transaction costs from the original contracting and the costs of name identification and systems development attributable to the Trient territory as a fraction of the whole Blockbuster operation nationwide.

Blockbuster does not address the potential for erosion in the real estate values that Trient may obtain in the market today. If competing systems establish their own stores in the Northwest during the pendency of this case, they will not be interested in bidding for Trient's locations, effectively destroying the current value of Trient's assets. If Blockbuster establishes its own chain of stores that compete with Trient, as it has begun, Blockbuster will be in a position to kill the value of its license to Trient and Trient's underlying leasehold assets.

### 3. *Severance.*

█ As inefficient as piecemeal litigation is, the order interpreting the assumption clause of the agreement will be severed because it suits both parties and because it simplifies the appellate procedure. It is being done reluctantly. The effect of this court's suggestion of what would have been proper is being used by Blockbuster to convert its misguided application for a writ of mandamus and premature appeal into a procedurally correct appeal. Blockbuster is being rewarded for fouling the case.

### 4. *Jurisdiction.*

█ Because the contract interpretation is the subject of the pending appeal and because the remand appears to be restricted to severance, the motion to reconsider must be denied for lack of jurisdiction.

Ordinarily, a notice of appeal divests the district court of jurisdiction and voids later actions by the district court. The policy of vesting exclusive jurisdiction over a case at one time is easy to apply when the trial court

has entered a final judgment, but as here, when the appeal is partial and interlocutory, the policy of stopping the whole case is less self-evident. Sometimes a distinction is drawn between a district court's power to grant and its power to deny a motion while an appeal is pending, suggesting that a district court could *deny* but not *grant* reconsideration. *Winchester v. United States,* 68 F.3d 947 (5th Cir.1995).

This court cannot deny the motion for reconsideration on the merits because if it cannot reach the merits to *grant* a motion for reconsideration, then it cannot reach the merits to *deny* a motion for reconsideration. Because the motion's merits cannot be reached, it must be denied for lack of jurisdiction.

### 5. *Reconsideration.*

Although this court is without jurisdiction to modify the order on the leases, Blockbuster has requested that the substance of the decision be modified on the addition to the record of assumption clauses in some of the Trient leases. If modification is unwarranted, it is moot to ask the court of appeals to remand for reconsideration; if modification should be made, it would require an application for remand to enable this court to correct its order. An indication of the necessity for reconsideration may be useful.

When the decision was made to construe the assumption-clause requirement of the agreement between Trient and Blockbuster, this court worked from the representation that none of the Trient leases had a clause expressly authorizing Blockbuster to assume Trient's position in the event the agreement was terminated. It now appears that the parties agree that twenty-three of the forty-three Trient leases contain a clause allowing Blockbuster to assume them. If this case were to be remanded for reconsideration, the question would be: What difference would that new information make?

### 6. *Term.*

Blockbuster asserts that the agreement contains two clauses that give it an express term. First, it says the default provisions are "express term" clauses. These cover things like death or bankruptcy of the franchisee. Second, it says that the provision allowing the franchisee to transfer the whole arrangement supplies an express term. Except for those approaches, the parties agree that the contract has no express period, calculable in years, money earned or lost, or external events.

### 7. *Default.*

The inclusion in an agreement of a clause stating that it will terminate on an event of default does not supply an express term to the agreement. A remedy predicated on the other party collapsing in whole or on its failing to perform a particular duty under the agreement is not parallel to a term that is fixed. Typical fixed terms say:

"... expires on December 31, 1990."

"... ends two years after the gross revenue exceeds $2 million per year."

"... continues so long as Shell operates its Deer Park refinery."

This contract has an indefinite term.

### 8. *Alienability.*

The franchisee's right to sell the operation represented by the agreement does not supply a fixed term. The obvious question is: What is the term of the agreement it sold? The text of the agreement does not supply the answer. The potential for alienability does not give the System License a fixed term. Interestingly, the restrictions on alienability all apply to transfers of the System License, and none of them applies to the site leases.

### 9. *Almost at Will.*

When an agreement does not include an express term, the law implies that it is terminable at the option of either party, but the option may be exercised only under reasonable circumstances. Because the parties did not expressly anticipate the end of their relation under the agreement, the law presumes that Trient may quit after Blockbuster has had an opportunity to recoup its costs and a reasonable return or after the parties' joint interest has been maximized. *See* Charles J. Goetz and Robert E. Scott,

*Principles of Relational Contracts,* 67 Va. L.Rev. 1089 (1981).

### 10. *Best Efforts.*

This court originally interpreted the agreement based on the representation that none of the leases that Trient had acquired for video stores contained clauses that allowed Blockbuster to assume the lease on termination of the relation between Blockbuster and Trient. Because the system license agreement required Trient to use its best efforts to include that clause, the court presumed that Trient had breached that obligation to Blockbuster.

Now, the facts are that twenty-three of the forty-three leases between Trient and the third-party landlords have that express assumption clause. Whether the leases could otherwise be assumed by Blockbuster is unknown, and it must be presumed against Trient at this stage of the litigation. It also now appears that the leases with the clause tend to be toward the early and the ones without tend toward the recent.

The facts about Trient's breach of its obligation to use its best efforts can be heard and damages awarded Blockbuster. A loss to Blockbuster is fully compensable by monetary damages, which can be easily determined at a later date. More important, the breach of this clause, which is only assumed, is rendered valueless by the meaning of the clauses themselves.

### 11. *The Assumption Clause.*

■ On reading the agreement as a whole, the conclusion is compelled that at the time the agreement was signed the parties could have reasonably expected that the right of Blockbuster to assume Trient's leaseholds would exist in the event of one of the defaults. Under a typical lease, Blockbuster has no right and no duty unless it chooses to assume the lease when the relation with Trient ends. The assumption clauses recite various conditions under which Blockbuster may take over Trient's stores, all of which are merely default provisions.

Blockbuster cannot explain Trient's defense under the agreement to Blockbuster's

canceling the relation at will and requiring Trient to transfer its leaseholds to Blockbuster. This series of leases in shopping centers in the Pacific Northwest has a value of about $75 million, and under the agreement Trient can buy or lease locations. It can extend, cancel, and modify leases as it chooses. It can pledge the lease rights to third-parties as security. It can sell the leases and later terminate its relation to Blockbuster, leaving Trient with no balance to assume. What it can achieve indirectly it ought to be able to do directly. If Trient renegotiated its leases so that they were tenancies at will, when the relation with Blockbuster ended, by default or otherwise, Blockbuster would have no property rights even in the leases that have the assumption clauses. The parties' having left everything about the land from site selection to financial risk to Trient manifests the expectation from inception that Blockbuster would have a remedy in the leases, not a title interest.

The provision that compels Trient to assign the balance of the lease applies only to cancellation for default. No one anticipated that Trient would want to sell its assets to a competitor. The parties agreed for default assumption by Blockbuster in contemplation of failure by Trient, not in contemplation of overwhelming success in its operation nor much less in anticipation that Blockbuster would change its corporate policy to compete with its own franchises. The assumption provisions were designed to ensure that Blockbuster's market would not be tarnished by the mis-operation of stores by unsuccessful franchisees and that its franchisees' failure would not force it to begin afresh.

### 12. *Real Estate.*

■ Blockbuster wants to convert its agreement with Trient, which is simply a system license and exclusive territory agreement, into an equitable title in real property. It then wants to convert that interest into an injunction preventing Trient from selling its assets while Blockbuster has the best of both worlds. Blockbuster cannot oblige the court to hold Trient's assets to Blockbuster's service while it works to destroy Trient's value. There is no equity in Blockbuster's position.

Under Texas law, real estate is presumptively unique. Even if the agreement gave Blockbuster the right to assume the leases in the absence of a default by Trient, Blockbuster would not have an equitable title because there is no privity between Blockbuster and Trient's landlords. *Forestpark Enterprises, Inc. v. John C. Culpepper,* 754 S.W.2d 775, 779 (Tex.App.1988); *see Banker v. Breaux,* 133 Tex. 183, 128 S.W.2d 23 (1939). Blockbuster is not bound by Trient's leases, as probably would be required for it to bind Trient's landlords. *Johnson v. Golden Triangle Corp.,* 404 S.W.2d 44 (Tex.Civ.App. 1966).

The "unique" real estate has been shown by Blockbuster not to be functionally irreplaceable because Blockbuster itself has already succeeded in placing competing music and videodisc stores nearly adjacent to Trient's unique locations. The leases are, of course, in Washington and Oregon. Despite its rigorous zoning, shopping centers are apparently not in short supply in Portland any more than in Houston.

Blockbuster complains that if Trient is allowed to sell its real estate interests Blockbuster will be without a presence in the important Portland–Seattle market, but this litigation was precipitated by Blockbuster's construction of a Blockbuster music store with laser videodisc rentals near one of Trient's video*tape* stores. Blockbuster's presence in the Trient market is in competition with Trient, although Trient may benefit somewhat from Blockbuster's music and laser videodisc store. Blockbuster's complaint is less equitable than Trient's that Blockbuster is using the modest change in technology from videotape to videodisc to undercut Trient's business.

By contrast, Trient has much to lose if it is prevented from selling its stores. With each day that passes while it is unable to close the sale of its stores, Trient's profits may be drastically affected by year-end sales and a fluctuating market—both for real estate and for consumer entertainment.

13. *Obligation to Blockbuster.*

██ The leases are transferable free of obligation to Blockbuster. Clauses about re-

turns of personalty, disclosure of sales figures for last operation, and discontinuance of Trient's use of proprietary colors, marks, manuals, systems, and similar property subsist if the leases are transferred as Blockbuster Superstores, which can be done only with Blockbuster's concurrence. Leases not transferred as Blockbuster Superstores are free of obligations to Blockbuster. Because none of the contingencies actually occurred that under the license would have been a default, Blockbuster has a claim in this action for the damages it suffered because it *might have been refused* assumption of a lease by twenty of the landlords *if* Trient had filed for bankruptcy.

*If* Trient cancels the agreement, Blockbuster can sue for its reliance costs.

14. *Conclusion.*

The leases are transferable free of obligation to Blockbuster. The additional data does not change the analysis. If this court had jurisdiction and were asked to reconsider, it would reach the conclusion embodied in the order of November 30, 1995. Whether that order should have been appealed is moot through the machinations of Blockbuster.

### APPENDIX

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

95–21008

In re Viacom, Inc., Blockbuster Videos, and Blockbuster Entertainment Corporation, Petitioners.

THE DISTRICT COURT'S RESPONSE
TO PETITION FOR MANDAMUS

1. *Introduction.* Blockbuster Entertainment Corporation, which has become Viacom, Inc., complains of an interlocutory judgment that its rights to Trient's underlying real estate interests are not burdened by an option in Blockbuster. The rendition arose on cross motions about the meaning of the agreement. If the decision is wrong in a particular and if the error translates into Trient's being liable to Blockbuster,

the injury to Blockbuster is fully compensable in damages.

2. *Background.* In the mid–1980s, Blockbuster engaged James M. Grisebaum to develop video rental stores in the Pacific Northwest. As authorized under the contract, Grisebaum now operates through Trient Partners. By the middle of 1995, Trient had established about forty "superstores" to rent videos under the Blockbuster name and systems in Oregon and Washington. Under a separate agreement, Grisebaum had a Blockbuster video region in the Midwest.

In 1995, Blockbuster itself began opening stores to sell recorded music. It opened a Blockbuster music outlet near one of Trient's principal Blockbuster video stores in Portland. Trient sought this court's interpretation of the agreements to ascertain whether the exploitation of Trient's video presence for the partially competitive music stores by its franchisor was permissible.

After this court's determination in the summer of 1995 that Blockbuster could indeed compete with Trient in the music business, Trient began to consider selling its operation. Trient and Blockbuster negotiated about Blockbuster acquiring the operations, but they could not agree on a price.

Trient retained an investment banker to sell its operation. Blockbuster became alarmed when it learned that the interested parties included other video rental chains—major, direct competition to Blockbuster. Trient's plan was to sell the locations and to return the proprietary personality to Blockbuster, ending the relation. Having now become the aggrieved party in this case, Blockbuster wants to use its license agreement to cloud the title to Trient's leases of the sites themselves. These leases are between Trient and independent third parties.

3. *Irreparability.* Blockbuster urges that it will be irreparably injured if it loses Trient as a franchise operator but insists that Trient will not be irreparably injured if its sale of the same assets is blocked. If the locations are unique at law, they are unique to Trient more than to Blockbuster because it was Trient that found, acquired, and developed them at its sole risk.

4. *Equity.* Blockbuster has no equities in its favor. Although it is permissible for Blockbuster to put its music stores near its franchisees' video stores, it was that calculated effort to leech directly on Trient's effort and risk that started the controversy. Now Blockbuster wants to compel Trient to apply its assets to Blockbuster's whole enterprise. If Trient refuses to let Blockbuster's competition from its music stores erode its profits, Blockbuster wants to seize the underlying assets.

Blockbuster does not see an emergency or an inequity arising from this court's interlocutory declaratory judgment allowing it to compete directly with Trient's video stores.

5. *Public Interest.* The diffuse, unrepresented public interest is harmed by Blockbuster's requested interim relief because the public has a legitimate interest in the free market for commercial real estate and for consumer video rentals.

6. *Profits & Returns.* Blockbuster speaks about Trient's profits, without mentioning that Blockbuster gets four percent of Trient's gross. Yes, Trient has been profitable. It is this very profitability that Blockbuster wants to keep captive. Trient's stores have a gross revenue of about $30 million annually; that yields about $100,000 per month to Blockbuster. More important, the bidding for the underlying leaseholds was to be in the neighborhood of $70 million.

Blockbuster did not deny that it had in fact received its reliance costs, including a handsome profit, from its commitment of resources to Trient's region; Blockbuster's costs are essentially the transaction costs from the original contracting and the costs of name identification and systems development attributable to the Trient territory as a fraction of the whole Blockbuster operation nationwide.

Blockbuster does not address the potential for erosion in the real estate values that Trient may obtain in the market to-

day. If competing systems establish their own stores in the Northwest during the pendency of this case, they will not be interested in bidding for Trient's locations, effectively destroying the current value of Trient's assets.

7. *Finality.* Beyond the issues of contract interpretation—one allowing Blockbuster's music stores and one allowing Trient's sale of the leaseholds—nothing more remains to be decided unless one of the parties seeks to ascertain the damages that resulted from either act. It might make sense to conclude this case with a severance of the damage issues contingent on a reversal of a contract claim on appeal, but Blockbuster has not sought to accomplish that. It leaps ahead.

8. *The Merits.* Because the parties wanted an answer in the few days before the bidding deadline, this court rendered an interpretation of the contract that was fully expected by both sides. Blockbuster likes the phrase *sua sponte;* it is disingenuous.

The contracting parties disagreed about their relative rights and obligations under the documents. They identified the paragraphs that they wanted considered. The resulting order was part explanation and part simple interpretation. No evidence needs to have been adduced about Blockbuster's reliance damages because, at this moment, Trient has not terminated the agreement. The question was one of current title to the leaseholds; but since it seems likely that Blockbuster will attempt to terminate Trient if it sells the real assets, the standard that probably applied, contrasted with the converse, seemed to be a useful, tentative ruling about law.

In the time allotted, the court could not call the parties back to court for a further colloquy about the documents and choices confronting them. Both sides take a narrow, selective, self-interested view of the phrases in the documents. That is to be expected. Blockbuster presents the court of appeals with the same view of the district court's role.

9. *The Agreement.* Under the agreement with Blockbuster, Trient was obliged to use its best efforts to have a clause in each of the leases allowing Blockbuster to assume the balance of the leasehold on termination of the agreement between Blockbuster and Trient. No lease of a superstore site to Trient has that clause—none. Even if that is a material breach, Blockbuster has yet to assert it as grounds for termination or damages. If that claim is made, it should be addressed. Certainly it should not be considered *sua sponte* by anyone.

Because the agreement would not prevent Trient from establishing Blockbuster video stores in property it owned or that it acquired in other ways, it would allow Trient to restructure its real estate obligations. If Trient rearranges its leaseholds so that it no longer has them, Blockbuster will cancel the agreement. if Trient goes bankrupt, Blockbuster will cancel the agreement. In every cue, however, Blockbuster and Trient are stuck with the leases as they exist, and as they exist, Blockbuster has no right to them, even though it may have an action for damages.

10. *Conclusion.* This is a rather simple case of contract interpretation. It has gone from a jointly profitable relation of eight years' standing to potential losses and litigation costs because Blockbuster made a policy decision to compete with its own franchisees after it acquired a chain of music stores. While that decision was legal under its contracts, Blockbuster should not have been surprised that at least one of its franchisees sought to capitalize its investment in the locations by selling them as a block to the highest bidder, who could have been Blockbuster.

Signed December 7, 1995, in Houston, Texas.